**WM. T. BURNETT & COMPANY, INC.**

v.

**The GENERAL TIRE & RUBBER COMPANY.**

**Civ. No. Y–77–540.**

United States District Court,
D. Maryland.

July 21, 1978.

Robert C. Prem, Baltimore, Md., A. W. Breiner, Arlington, Va., for plaintiff.

David F. Albright, Baltimore, Md., Herbert Blecker, John T. Kelton, Watson, Leavenworth, Kelton & Taggart, New York City, Frank C. Rote, Akron, Ohio, for defendant.

JOSEPH H. YOUNG, District Judge.

By an amended complaint filed August 15, 1977, plaintiff Wm. T. Burnett & Company, Inc. (Burnett) seeks to recover damages from defendant, The General Tire & Rubber Company (General) for loss of patent rights attributable to defendant's fraudulent conduct in patent procurement.

The parties were involved in lengthy interference proceedings before the United States Patent Office from 1962 until 1966 to determine the priority of invention of a process for making polyurethane foam. The proceeding resulted in an award of priority to General, from which plaintiff did not appeal. General ultimately obtained two patents, one relating to the process of blowing poly*ester* polyurethane foam, and one for poly*ether* polyurethane foam.

In subsequent litigation which did not involve Burnett, General claimed patent infringement by various companies, and one patent was declared unenforceable in part, due to failure to disclose certain information to the Patent Office during patentability proceedings. Although those proceedings were separate from and prior to the interference action, plaintiff claims that its inability to obtain a patent was a direct result of the fraud, and prays damages based upon a reasonable royalty which it would have obtained but for the fraud.

The plaintiff's theory may be summarized as follows: if the defendant had disclosed the information, its patent application would have been denied; there would therefore have been no interference with plaintiff's application; and plaintiff would have obtained the patent.

General has moved to dismiss the complaint, or in the alternative, for summary judgment. The motion will be granted since plaintiff is precluded on various grounds from raising issues vital to its claim.

## BACKGROUND

General is the holder of two patents which are relevant in this litigation: NO. 3,072,582, POLYETHER–URETHANE

FOAMS AND METHODS OF MAKING SAME, patented January 8, 1963; and NO. 3,391,093, POLYESTER–POLYURETHANE FOAMS AND METHODS OF MAKING SAME, patented July 2, 1968 (Exhibits 1 and 2 to the motion to dismiss the complaint).

Both patents originated with application Serial No. 541,823, filed on October 20, 1955. That application disclosed a particular method of making polyurethane foam which had been developed by Charles Frost, an employee of General. (Hereinafter this will be referred to as the Frost application or the parent application.)

The formation of a polyurethane from component substances involves use of a gas-forming material called a "blowing agent" which causes foaming.[1] Many materials cause the expansion of the foam—i. e., act as "additives in the process which form a gas and cause the urethane to expand into a cellular structure." 398 F.Supp. at 1356. The agents used by Frost, which included various halogen-substituted alkanes, avoided problems connected with the use of other agents, such as gas escaping and causing crust to form or foams shrinking or collapsing after the initial rise.

The parent application disclosed the process for both polyester and polyether foams.[2] The patent examiners rejected it as unpatentable on four occasions. In his third decision, June 24, 1958, the examiner cited prior art in the form of two foreign patents—the Hochtlen patent, a German patent; and the Wingfoot patent, a Belgian patent—as a reason for rejection. General then sought to distinguish Frost's work from the prior art in Hochtlen on the basis that the halogenated hydrocarbons used by Frost had different boiling points. Rejecting this distinction and denying patentability for the fourth time in May, 1959, the examiner stated:

. . . it is not seen wherein the difference in boiling points is critical or patentable. Mere assertions as to superior or unpredictable results are of no weight in the absence of proper corroborating evidence.

Patent examiner's conclusions, quoted at 398 F.Supp. at 1359.

General did not respond to this invitation to document its assertions, but filed two continuation-in-part applications (CIPs), Serial Nos. 803,380 and 893,381 in 1959, for making polyester and polyether urethanes respectively.

The polyether application matured into Patent No. 3,072,582, patented January 8, 1963, which was the subject of numerous patent infringement actions brought by General Tire and consolidated by the Panel on Multidistrict Litigation.

Fraud in procurement is a well-established defense to an infringement claim, *Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945).

After consolidation, a separate trial was ordered on the issue of alleged fraud by General in procuring the polyether method patent, *In re Multidistrict Litigation Involving Frost Patent, supra.* The deceptive behavior which General was determined to have practised in that case is the basis for the present claim.

The Hochtlen and Wingfoot patents only disclosed the use of their respective blowing agents for blowing poly*ester* polyurethanes. The crux of the fraud was General's failure to report to the examiner the results of experiments by its employees, which successfully used these agents for blowing poly*ether* foam. The undisclosed tests were done in 1958 and prior to May 4, 1959, when the parent application was rejected for the fourth time.

---

1. The background data is derived from the pleadings, including exhibits and the district court and appellate decisions in the infringement case, *In re Multidistrict Litigation Involving Frost Patent*, 398 F.Supp. 1353 (D.Del. 1975); *affirmed in part, reversed in part,* 540 F.2d 601 (3rd Cir. 1976).

2. One component of polyurethane is a polyol. Polyester polyurethanes are made from polyester polyols and polyether polyurethanes are made from polyether polyols.

In the multidistrict litigation, the court held that the selective disclosure of only those experiments which showed that the Hochtlen and Wingfoot agents were inoperative for poly*ethers*, was an intentional misleading of the Patent office in a matter which might have affected the decision.

In its initial prosecution of the polyether CIP, General included a range of agents which covered agents disclosed by the prior patents. The examiner held that General's use of the Hochtlen and Wingfoot agents for polyether urethanes, rather than polyester urethanes, did not involve invention. Although the polyether application, when approved, no longer contained the Hochtlen and Wingfoot agents, the court held that failure to disclose the polyether tests using those agents was nonetheless a material omission, since it might have influenced the decision on patentability in view of prior art. The court reasoned that:

> If the examiner had known methylene chloride [a Hochtlen agent] is operative in processes using both polyethers and polyesters, his position that processes using polyesters are analogous to processes using polyethers would have been strengthened, and he might have continued to assert Hochtlen as a reference against processes utilizing polyethers. . . .
>
> Since the claims were narrowed to exclude methylene chloride, it is entirely possible that the examiner would have dropped the Hochtlen reference even if successful use of methylene chloride had been disclosed. It is also possible, however, that the examiner would have felt that substitution of the claimed freons, alkanes and alkenes for methylene chloride would have been obvious to one of ordinary skill in the art; accordingly, he would have continued to reject the claims as unpatentable over Hochtlen.

398 F.Supp. at 1372, and footnote 38.

Concluding that there was both fraudulent intent and a material nondisclosure, the court held the Frost patent invalid. The reasoning was affirmed on appeal, but the appellate court did not hold the patent invalid. Instead, enforcement was denied only to the extent that the patent covers *flexible* polyether urethane foams. The patent thus remains enforceable as to *rigid* polyether urethane foams. 540 F.2d at 611.

Burnett, in the name of Dr. Klesper, a research chemist in its employ, filed patent application Serial No. 610,658 (the Klesper application), on September 18, 1956. This application, based on Klesper's work using liquid haloalkanes as blowing agents for polyurethane foams, was prior to General's two CIP applications, filed in 1959, but subsequent to the parent application, filed in 1956.

On December 10, 1962, the Patent Office declared interference No. 93,228 between the Klesper application and Frost application No. 803,380, which is the poly*ester* CIP, filed in 1959. An interference is declared to determine the issue of priority of invention between different applications or between an application and a patent. It is declared when each contains "claims for substantially the same invention which are allowable in the application of each party." 37 CFR § 1.201(a) & (b).

In the interference between Frost and Klesper, the Frost application was accorded the benefit of the 1955 filing date of the parent application. Klesper, therefore, was the junior party with the burden of overcoming the presumption that inventions are made in the same chronological order as their filing dates. 35 U.S.C. § 102(e); 37 CFR 1.257.

However, the award of priority to Frost did not rest on the difference in filing dates, pursuant to § 102(e), but on Frost's earlier reduction of the invention to practice, pursuant to § 102(g). In response to Klesper's contention that Frost should not have been granted the benefit of the 1955 date, the Board stated:

> . . . we are of the view that Frost has established an actual reduction to practice prior to the filing date of his parent application, so that it is not essential to our decision that Frost be accorded the benefit of the filing date of this application.

Patent Interference No. 93,228, *Klesper v. Frost* at p. 7 (Copy attached to defendant's motion to dismiss as Exhibit 3.) The Board found that the Frost invention had been reduced to practice prior to the filing of the parent application and prior to the earliest date when Klesper could assert invention. The Frost polyester CIP matured into Patent No. 3,391,093, patented July 2, 1968.

In summary, General's application for a patent for a poly*ester* urethane foam process was awarded priority over Burnett's application in interference proceedings. No part of the resulting patent has ever been held invalid or unenforceable. General's polyether patent was held partially unenforceable, due to fraud in procurement, during patent infringement litigation not involving Burnett. Since different applications were involved in the interference and infringement proceedings, there is a threshold question of causal connection between defendant's fraud and plaintiff's loss in the interference.

Plaintiff seeks to bridge the gap by alleging that both General patents are tainted by the fraud, because they derived from the same parent application. The undisclosed experiments were performed prior to General's decision to file two CIPs. The fraud may have been relevant to this decision, and also to the conclusion concerning patentability in both cases.

While plaintiff may encounter difficulties proving this "taint," the allegations of the amended complaint are sufficient to avoid dismissal on this basis.

## STATEMENT OF ISSUES

Plaintiff seeks damages for the reasonable value of royalties for patents it allegedly would have obtained if there had been no fraud by General. Plaintiff would differentiate its claim from an action to obtain a patent or to appropriate the patents owned by General, stating: "Burnett recognizes that long prior to the date of its complaint it was precluded from such action." Plaintiff's memorandum opposing dismissal at p. 11.

Despite this distinction, plaintiff is, in fact, claiming the benefits of General's patent, and cannot prevail without establishing that it, not General, would have obtained the patent if the Patent Office had known of the fraud.

Plaintiff cannot now relitigate the issue of priority. This was the very issue litigated between the parties in the interference, and Burnett's time for appeal has long since passed. Whether a fraud directly related to the order of invention would constitute an exception to the principle of *res judicata* need not be decided, since there is no such issue under the facts of this case. The fraud related to events in 1958 and to the issue of superiority over prior art. It would not have changed the Board decision on priority between Klesper and Frost, based on the level of work each had attained by 1955.

Therefore, to recover for loss of patent rights, plaintiff must prove that Klesper's work would have been patented, despite prior invention by Frost. This proposition contains inherent difficulties. The basis for the interference and for plaintiff's present claim is that Klesper's process was substantially identical to Frost's. If the undisclosed experiments would have led the patent examiner to conclude that the Frost application was not superior to prior art, it appears logical that the same reasoning would have made Klesper's work unpatentable. This would mean that Burnett lost no patent rights due to the fraud, and has no basis to claim damages here.

However, although plaintiff would have a long row to hoe to avoid this conclusion, the claim cannot be dismissed on this ground without affording it an opportunity to do so. Given the long time period since the Board's decision and the highly complex, technical nature of the subject matter, it appears virtually impossible that plaintiff can sustain the burden of showing harm which is more than speculative. However, these questions need not be reached.

As stated above, since the fraud does not change the priority, plaintiff cannot successfully assert loss of patent rights due to

the fraud, unless the fraud would, on some theory, have nullified the Frost application. Two possible theories are:

1. The Frost invention would have been found unpatentable if the information had been disclosed; therefore, no interference, could have arisen.

2. The Patent Office would have stricken the application under its rules as a penalty for fraud; therefore, no interference would have arisen.

The claim will be dismissed since the plaintiff may not raise these issues in this Court for the type of relief[3] it seeks.

## I. A PLAINTIFF WHO HAS LOST ON THE ISSUE OF PRIORITY CANNOT ATTACK PATENTABILITY.

■ Since plaintiff is bound by the former decision on priority under principles of *res judicata,* the question is: whether a plaintiff, who loses on appeal from an adverse Patent Office priority decision can require the court to adjudicate the patentability of the opponent's invention.[4] Assuming *arguendo* that the time does not bar the patentability issue, since the fraud relates to patentability, plaintiff's rights cannot be greater than they would have been in a timely appeal from the interference decision.

Since the law is well settled that courts will not adjudicate patentability in an appeal from an interference decision decided on priority, Burnett cannot now ask the Court to hold Frost's invention unpatentable.

Appeal from a Board decision in interference proceedings may be to the Court of Customs and Patent Appeals or by initiation of a civil action in federal district court, 35 U.S.C. §§ 141, 146. Either party can require the other to accept *de novo* review in district court, rather than review by the Court of Customs and Patent Appeals, *Tibbetts Industries, Inc. v. Knowles Electronics, Inc.,* 386 F.2d 209 (7th Cir. 1967). In either case, the statute provides that the remedy is available for a party "dissatisfied with the decision of the board of patent interferences *on the question of priority"* 35 U.S.C. §§ 141, 146 (emphasis added).

Therefore, even in district court, only questions relating to priority are considered. The issue of patentability does not come under this heading, *Sanford v. Kepner,* 344 U.S. 13, 73 S.Ct. 75, 97 L.Ed. 12 (1952). In *Sanford,* plaintiff sought review of the adverse interference decision by bringing a bill in equity, under R.S. § 4915, 35 U.S.C. § 63, the precursor to 35 U.S.C. § 146, seeking to be adjudged the inventor, and asking that Kepner's claims be adjudged unpatentable because of prior patents. Because it agreed with the Patent Office priority decision, the district court refused to consider the challenge to patentability. The Supreme Court granted certiorari specifically to resolve the conflict among the circuits "concerning the duty of district courts to consider and adjudicate questions of invention and patentability when parties urge them in R.S. § 4915 proceedings," 344 U.S. at 14, 73 S.Ct. at 76, and held that the trial court which affirms on priority does not need to reach the issue of patentability. In reasoning which is directly applicable to the present case, the Court stated:

> The obvious purpose of . . . R.S. § 4915 is to give a judicial remedy to an applicant who has been finally denied a patent because of a Patent Office decision against him and in favor of his adversary on the question of priority. When the trial court decides this factual issue of priority against him and thus affirms the refusal of the patent by the Patent Office, he has obtained the full

---

**3.** The complaint also refers to the Patent Office's refusal to declare an interference between General's poly*ether* patent and plaintiff's work. It is difficult to conceptualize a basis for relief from such events. All of the reasons which prevent plaintiff from raising the primary claims apply with even greater force to the other allegations.

**4.** Because plaintiff is bound by the adverse finding on priority, it is in the same position as a party who appeals the finding and loses on appeal.

remedy the statute gives him. Only if he wins on priority may he proceed. In that event, the statute says, the court may proceed to "adjudge that such applicant is entitled, according to law, to receive a patent for his invention . . . ." So adjudging, it may authorize issuance of the patent. But judicial authorization of issuance implies judicial sanction of patentability and for this reason this Court has said, "It necessarily follows that no adjudication can be made in favor of the applicant, unless the alleged invention for which a patent is sought is a patentable invention." *Hill v. Wooster,* 132 U.S. 693, 698, [10 S.Ct. 228, 33 L.Ed. 502.] The principle of the *Hill* case is that the court must decide whether claims show patentable inventions before authorizing the Commissioner to issue a patent. No part of its holding or wording nor of that in *Hoover Co. v. Coe,* 325 U.S. 79, [65 S.Ct. 955, 89 L.Ed. 1488,] requires us to say R.S. § 4915 compels a district court to adjudicate patentability at the instance of one whose claim is found to be groundless. Sanford's claim was found to be groundless.

It is unlikely that this equity proceeding would develop a full investigation of validity. There would be no attack on the patent comparable to that of an infringement action. *Here the very person who claimed an invention now asks to prove that Kepner's similar device was no invention at all because of patents issued long before either party made claim for his discovery. There is no real issue of invention between the parties here and we see no reason to read into the statute a district court's compulsory duty to adjudicate validity.*

344 U.S. at 15–16, 73 S.Ct. at 76–77 (emphasis added.)

When *Kepner* was decided, the statutory review provisions did not explicitly state that review was available for the dissatisfied party in interference "on the question of priority." The addition of this phrase gives added force to *Kepner.* Although *Kepner* can be read as making district court review of patentability at the behest of one

who has lost on priority permissive, courts overwhelmingly refuse to provide such review. *E. g., E. I. duPont de Nemours & Co. v. Celanese Corp.,* 291 F.Supp. 428 (S.D.N.Y. 1968); *Turchan v. Bailey Meter Co.,* 19 F.R.D. 201 (D.Del.1956).

In view of the added statutory wording, both district courts and the Court of Customs and Patent Appeals have regarded the scope of appeal limited to questions of priority or ancillary to priority. *Sperry Rand Corp. v. Bell Telephone Laboratories, Inc.,* 171 F.Supp. 343 (S.D.N.Y.1959); *Glass v. De Roo,* 239 F.2d 402, 44 CCPA 723 (1956).

The sound policy considerations against having the loser on priority challenge patentability are well expressed in *Sperry Rand,* where the court stated:

To allow this new issue to be injected into the case under these circumstances would be an invitation for litigants to raise the issue of "operativeness" anew in every case where a party is dissatisfied with the decision of the Board of Patent Interferences. It would encourage parties to trade on the "ignorance" of the court in complicated technical matters with the hope that a judge, untrained in the intricacies of technology, might find inadequate disclosure of inoperativeness.

171 F.Supp. at 348.

This approach is consistent with the statutory scheme, which only allows the "applicant" to appeal a patentability decision, 35 U.S.C. § 141, § 145. No statutory basis is provided for a private party to challenge the Patent Office decision on patentability, and only the United States may sue to cancel or annul a patent. *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.,* 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965). Courts should not exercise their equitable powers in this area to subject a patentee "to innumerable vexatious suits to set aside his patent." *Mowry v. Whitney,* 14 Wall. 434, 441, 20 L.Ed. 858 (1872).

■ Private parties may challenge patent validity in two situations: as a defense to patent infringement suits and in suits to

enforce the antitrust laws. *Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co.,* 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945); *Keystone Driller Co. v. General Excavator Co.,* 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293 (1933); *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., supra.*

The Supreme Court has held that the public interest in the integrity of the patent process is promoted by allowing a defendant charged with infringement to attack the validity of the patent on various grounds, including fraudulent conduct in procurement. In *Precision Instrument, supra,* the Court stated:

> A patent by its very nature is affected with a public interest. As recognized by the Constitution, it is a special privilege designed to serve the public purpose of promoting the "Progress of Science and useful Arts." At the same time, a patent is an exception to the general rule against monopolies and to the right to access to a free and open market. The far-reaching social and economic consequences of a patent, therefore, give the public a paramount interest in seeing that patent monopolies spring from backgrounds free from fraud or other inequitable conduct and that such monopolies are kept within their legitimate scope.

324 U.S. at 816, 65 S.Ct. at 998.

However, the defensive use of fraudulent procurement in infringement claims and offensive use by a disappointed applicant are very different. As indicated above, courts recognize the problems of vexatious suits. Further, as the plaintiff poses the issues in this case, the public interest in preventing the monopolistic benefits of a patent from being conferred upon an unpatentable idea would not be promoted. As plaintiff states, the patent would stay in effect; the only difference would be that plaintiff would get the benefits.

For the same reason, the ability of private parties to challenge patents for fraudulent procurement under the antitrust laws does not provide a basis for relief. In *Walker, supra,* a defendant charged with patent infringement counterclaimed that Walker had developed an illegal monopoly through fraudulent procurement. The Court of Appeals affirmed the dismissal of the counterclaim, on the ground that fraud on the Patent Office may not be used "in an original affirmative action, instead of as an equitable defense." *Food Machinery and Chemical Corp. v. Walker Process Equipment, Inc.,* 335 F.2d 315, 316 (7th Cir. 1964). The Supreme Court rejected this distinction only for purposes of claims brought under the antitrust laws; in other respects, it reiterated the rule against private parties challenging patent validity:

> We have concluded, first, that Walker's action is not barred by the rule that only the United States may sue to cancel or annul a patent. It is true that there is no statutory authority for a private annulment suit and the invocation of the equitable powers of the court might often subject a patentee "to innumerable vexatious suits to set aside his patent.". . . But neither reason applies here. Walker counterclaimed under the Clayton Act, not the patent laws. While one of the elements is the fraudulent procurement of a patent, the action does not directly seek the patent's annulment. The gist of Walker's claim is that since Food Machinery obtained its patent by fraud it cannot enjoy the limited exception to the prohibitions of § 2 of the Sherman Act, but must answer under that section and § 4 of the Clayton Act in treble damages to those injured by any monopolistic action taken under the fraudulent patent claim. Nor can the interest in protecting patentees from "innumerable vexatious suits" be used to frustrate the assertion of rights conferred by the antitrust laws. It must be remembered that we deal only with a special class of patents, *i. e.,* those procured by intentional fraud.

382 U.S. at 175–176, 86 S.Ct. at 349–350.

The language of *Walker* applies only to suits brought under the antitrust laws, and has not been extended.

The inability of the party disappointed in interference proceedings to raise the issue

of fraud in procurement, where not relevant directly to priority of invention, is well stated in *Standard Oil Co. v. Montedison, S.p.A.,* 540 F.2d 611 (3rd Cir. 1976):

We do not regard the discretionary power of the district court to permit an issue of fraud to be raised for the first time in a § 146 action as extending to issues of fraud which are not involved in the interference proceeding itself. For it is only fraud which may have affected the determination by the Board of the factual issue of priority of invention, i. e., the question as to which of the parties involved in the interference actually first used the device or process of the invention, which could have any effect on the determination by the Board of that historical fact. While other fraud might well affect the right of the party perpetrating it to receive a patent even though he was in fact the first of the parties to the interference to use the invention, it obviously could not change the historical fact of priority itself or authorize a finding that another party had priority of invention whose use had actually been anticipated by the first party. What effect, if any, a finding of such fraud might have upon the rights of other parties than the perpetrator would appear to be a matter for determination by the Commissioner of Patents and Trademarks and the courts in appropriate litigation, not by the Board in the interference proceeding or by the district court, upon review under § 146 of the Board's determination of priority of invention in that proceeding.

540 F.2d at 617.

In summary, plaintiff, by virtue of having been involved in an interference with General, did not acquire any right to challenge patentability. Similarly, plaintiff cannot analogize itself to a defendant in a patent infringement case, and raise the fraud found therein to assert affirmative claims here. The considerations which allow fraud in procurement to be raised in antitrust claims and as a defense to patent infringement do not apply here. On the contrary, the manifold difficulties, inherent

in such a suit, illustrate the soundness of the legislative decision not to give a cause of action to private parties on the question of patentability.

## II. THE COURT CANNOT NOW APPLY PATENT OFFICE RULES WHICH ALLOW THE DISCRETIONARY STRIKING OF IMPROPER APPLICATIONS.

██ Under Patent Office Rule 56:

Any application signed or sworn to in blank, or without actual inspection by the applicant, and any application altered or partly filled in after being signed or sworn to, and also any application fraudulently filed or in connection with which any fraud is practiced or attempted on the Patent Office, may be stricken from the files.

There is no specific statutory basis for striking applications in these situations, but the Rule is properly promulgated pursuant to 35 U.S.C. § 6, which gives rule-making authority to the Commissioner. *Norton v. Curtiss,* 433 F.2d 779, 57 CCPA 1384 (1970). Since the decision to strike is at the discretion of the Patent Office, it can be reviewed only for abuse of discretion. *Norton v. Curtiss, supra; Vandenberg v. Reynolds,* 268 F.2d 744, 46 CCPA 938 (1959); *Vandenberg v. Reynolds,* 242 F.2d 761, 44 CCPA 873 (1957).

██ In the instant case, the Rule 56 issue was not considered in the Patent Office, and the Court has no decision to review. Although district court review is *de novo,* a claim which rests entirely on an act which is discretionary with the Commissioner is inherently one which cannot be decided by the Court in the first instance. This is consistent with the general rule, that in district court proceedings, the parties are confined to contentions made in the Patent Office, and may generally only raise additional evidence, not additional issues. The nature of district court review is well expressed in *Monsanto Co. v. Kamp,* 269 F.Supp. 818 (D.D.C.1967), where the court stated:

They [actions to review rejected patent applications and adverse interference decisions] are proceedings of a hybrid nature. They are sometimes denominated "trials *de novo*", but such use of this term is somewhat loose. Proceedings in this Court in actions of these two types are not true or genuine trials *de novo.* The administrative record of the Patent Office forms the nucleus of the evidence before the District Court. Unlike, however, the customary judicial review of administrative decisions where the administrative agency acts on a record, the Court does not confine itself to that record in these cases. Additional evidence is admissible in support of contentions advanced by the parties in the Patent Office.

269 F.Supp. at 822. *See also Stamicarbon, N. V. v. Chemical Construction Corp.,* 544 F.2d 645 (3rd Cir. 1976).

Further, under the facts of this case, plaintiff might well not have received an *inter partes* decision on Rule 56 in the administrative interference proceeding. As stated above, the Patent Board in interferences hears only issues ancillary to priority. In *Norton* and *Vandenberg, supra,* a question was raised as to whether the opponent in interference could require consideration of Rule 56 *inter partes,* or whether it was a matter for *ex parte* consideration by the Commissioner after priority was determined.

In *Norton,* it was argued that the Rule 56 challenge was based on events which occurred three years after the application was filed and could have no effect on priority. The court disagreed, stating:

. . . If the charges made by Norton are found to be of substance, Curtiss stands to lose, at the least, his right to have those claims in his present application to which the charges relate mature into a patent. That translates, in this case, to a loss of standing as a party to the interference. This question is clearly one which is ancillary to priority and was therefore properly considered by the board and must now be reviewed by this court.

433 F.2d at 783.

While the analogy to the instant case is clear, a key distinction must be made. In both *Vandenberg* and *Norris,* it appeared that the filing dates would decide the priority issue, since filing dates are treated as constructive reductions to practice when neither party proves a reduction to practice prior to filing, 35 U.S.C. § 102(e).

But, that is not the situation here. As stated, the Board determined that Frost reduced the invention to practice before the first filing date. Therefore, even if the application had been stricken, General would still have had priority, despite losing the benefit of the earlier filing date, 35 U.S.C. § 102(g).

In summary, viewed from any perspective, plaintiff cannot claim loss of patent rights as a result of the fraud and is not entitled to damages. If the fraud had been brought to light earlier, if General's application had been stricken, if General's claims were unpatentable, plaintiff would not have had priority. Under the statutory scheme, the applicant without priority cannot challenge patentability or other issues not ancillary to the issue of priority. In balancing the public interest in fraud-free patent proceedings and the patentee's interest in freedom from vexatious suits, the legislature struck the balance against allowing attacks on validity by one in plaintiff's position with its purposes. It is not for this Court to change the congressional scheme.

Accordingly, it is this 21st day of July, 1978, by the United States District Court for the District of Maryland, ORDERED:

That the motion to dismiss the complaint be, and the same is, hereby GRANTED.