**UNITED SWEETENER USA, INC., and Holland Sweetener Company, Vof, Plaintiffs,**

**v.**

**The NUTRASWEET COMPANY, Defendant.**

**Civ. A. No. 89–245–JRR.**

United States District Court, D. Delaware.

March 22, 1991.

**402**

John Mulford, of Theisen, Lank, Mulford & Goldberg, Wilmington, Del. (Carl G. Love (argued), Chris Comuntzis, Lynn E. Eccleston, and Jeffrey A. Simenauer, of Cushman, Darby & Cushman, and Thomas J. Macpeak, and Peter D. Olexy, of Sughrue, Mion, Zinn, Macpeak & Seas, Washington, D.C., of counsel), for plaintiffs.

Charles S. Crompton, Jr., of Potter, Anderson & Corroon, Wilmington, Del. (Robert G. Sugarman (argued), and Steven D. Glazer, of Weil, Gotshal & Manges, and Robert L. Baechtold, and Henry J. Renk, of Fitzpatrick, Cella, Harper & Scinto, New York City, of counsel), for defendant.

ROTH, District Judge.

Lucia Vanderwalk moved to a sofa and took a seat by the tea service. It was a signal for the men to sit. Her hands moved powerfully, gracefully, over the silver, seeming to communicate with it.

"Tell me about yourself, Leftenant." She pronounced his rank that way, British. *Lef*, not *lou*.

"I was born in New York, I grew up in New York, I became a cop in New York."

"Homicide or vice?"

"Homicide."

"You look familiar." She stared at him, something more than ordinary interest in her eyes. "Ceylon or China?"

He realized she was talking tea and he figured what could he lose. "China."

She poured from the teapot on the left. "Lemon or milk?"

"Lemon, please."

"Sugar"—she glanced at him—"or Nutrasweet?"[1]

## I. INTRODUCTION

Patent litigation, while not as intriguing as homicide investigation, often has high stakes and interesting twists and turns. Our attention today focuses on a dispute over an artificial sweetening product known throughout the world as aspartame or Nutrasweet.[2] In contrast to the lengthy and somewhat complicated factual background to this dispute, the procedural posture of the case is relatively simple.

On May 16, 1989, plaintiffs United Sweetener, USA, Inc. ("United Sweetener") and Holland Sweetener Co., Vof ("Holland Sweetener") initiated the present declaratory judgment action against defendant Nutrasweet Co. In their complaint the plaintiffs seek, among other relief, a declaration of the invalidity of two patents that pertain to aspartame, patent number 3,492,131 ("the '131 patent") for peptide sweetening agents, issued on January 27, 1970, and patent number 3,780,189 ("the '189 patent") for sweetening compositions and method for use thereof, issued on December 18, 1973. Count I of the complaint alleges that the '189 patent is unenforceable due to inequitable conduct on the part of Nutrasweet. Count II alleges that the same patent is invalid because of the effect of certain prior art; because it is obvious; and because of a foreign patent in existence when a continuation-in-part application for the patent was filed. Count III of the complaint asks this court to declare that the plaintiffs have not infringed the '131 patent. Finally, Count IV asserts that the two patents involved here are unenforceable due to certain inequitable conduct by Nutrasweet during its successful application for an extension of the two patents.[3]

---

**1.** E. Stewart, Privileged Lives 315–16 (1988) (detective fiction).

**2.** Defendant Nutrasweet Co. markets aspartame under the brand name "Nutrasweet." To avoid confusion, all references to "Nutrasweet" in this opinion pertain to Nutrasweet Co., its predecessor entities, and prior assignors of the patents at issue in this case. The chemical compound under consideration here shall be referred to as "aspartame."

**3.** Count IV also alleges that Nutrasweet has misused the patents. In their briefs, plaintiffs did not oppose Nutrasweet's arguments for dismissal of the misuse claim. In these circumstances, we must assume that the plaintiffs have abandoned this aspect of Count IV, and therefore grant the motion to dismiss to that extent.

In response to the complaint, Nutrasweet now moves to dismiss Counts I, II, and IV. Both sides of this dispute move for summary judgment on Count III. For the reasons explained below, we will deny the motion to dismiss Counts I and II. As to Count III, we will grant plaintiffs' motion for summary judgment on claim 2 of the '131 patent on the ground that they do not infringe that claim. We find, however, that there are genuine issues of material fact in dispute with regard to claim 8. The cross-motions for summary judgment on that claim will be denied. Finally, we will grant Nutrasweet's motion to dismiss Count IV.

## II. DISCUSSION

Both the '131 and '189 patents name certain dipeptide chemical compounds as sweetening agents, the '131 patent covering compositions involving dipeptides and the '189 patent covering mixtures of dipeptides with known sweetening agents, resulting in an enhanced sweetening potency. Most relevant to this litigation is the fact that both patents name the chemical L-aspartyl-L-phenylalanine methyl ester. This chemical is more commonly known as "aspartame." Holland Sweetener currently produces and markets aspartame products in the Netherlands and exports them for sale in other countries. United Sweetener, a wholly owned subsidiary of Holland Sweetener, has imported a large inventory of a table top sweetener blend of aspartame and saccharine into the United States. It has also imported aspartame for use in the manufacture of table top sweetener. United Sweetener now stands ready to sell its product in the State of Delaware.

### A. Counts I and II

The parties apparently agree that on May 16, 1989, when plaintiffs filed their complaint in this action, they were faced with the threat of a suit for infringement of the '189 patent. However, defendant contends that its July 7, 1989 "promise" not to assert the '189 patent against plaintiffs until after the conclusion of reexamination proceedings[4] has eliminated any reasonable apprehension of an infringement suit.

Nutrasweet first argues in its motion to dismiss Counts I and II that this Court lacks jurisdiction over the '189 claim because there is no "actual controversy" as required by the Declaratory Judgment Act. Nutrasweet believes that, under applicable case law, its promise not to assert the '189 patent negates the "actual controversy" that existed when the complaint was filed. The plaintiffs, of course, disagree.

The Declaratory Judgment Act provides in pertinent part that:

In a case of *actual controversy* within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration....

28 U.S.C. § 2201(a) (emphasis supplied). The parties agree on the basic test to be applied in determining whether an actual controversy exists in a declaratory judgment action brought by a potential infringer against a patentee. The plaintiff must show that:

the defendant in such an action ... engaged in conduct that created on the part of the declaratory judgment plaintiff a reasonable apprehension that it will face

---

**4.** The reexamination of the '189 patent was initiated by plaintiffs in May 1988. Reexamination is a procedure by which any person may challenge the patentability of an extant patent on the basis of prior art. 35 U.S.C. § 301. Such a challenger must file a formal request for reexamination. 35 U.S.C. § 302. If the Commissioner of Patents and Trademarks finds that the request raises substantial new questions of patentability, 35 U.S.C. § 303, the Commissioner orders a reexamination. 35 U.S.C. § 304. These reexamination proceedings are then conducted with only the PTO and the patent owner participating. 35 U.S.C. § 306. The Examiner in charge of the reexamination either upholds or rejects the patent. *See* 35 U.S.C. §§ 132, 305. A patentee whose claims are twice rejected, as in fact has occurred in the case here, may appeal to the Board of Patent Appeals and Interferences. 35 U.S.C. § 134. If the latter administrative review is not satisfactory, the patentee may appeal to either the United States Court of Appeals for the Federal Circuit, 35 U.S.C. § 141, or to the United States District Court for the District of Columbia, 35 U.S.C. § 145.

an infringement suit if it commences or continues the activity in question ... Next, the plaintiff seeking a declaration of invalidity must [show that it has] actually produced the accused device or [has] actually prepared to produce such a device.

*Jervis B. Webb Co. v. Southern Systems, Inc.,* 742 F.2d 1388, 1398–99 (Fed.Cir.1984) (citation omitted). Thus, the declaratory judgment plaintiff must demonstrate "reasonable apprehension" of suit and production or preparation for production of an infringing product.

■ There is no dispute here that the plaintiffs have met the second part of the test: They are prepared to market their sweetener product, SweetMatch. The issue we must determine is that of the first part of the test, i.e., "reasonable apprehension." Nutrasweet does not contest that reasonable apprehension existed when the complaint was filed. It claims, however, that such apprehension no longer exists, and for that reason dismissal is warranted. We must determine whether, as Nutrasweet argues, reasonable apprehension must exist throughout the litigation, or merely, as the plaintiffs assert, at the time the complaint is filed. If we adopt the plaintiffs' view, Nutrasweet's promise not to sue pending the outcome of the reexamination will have no effect on the ultimate determination of whether the plaintiffs in fact possess the requisite reasonable apprehension. If we adopt the defendant's view, we must go on to consider whether defendant's promise is sufficient to relieve plaintiffs of the apprehension of suit.

The cases cited by the parties present a square and seemingly irreconcilable conflict of authority on this issue. The Federal Circuit alluded to the question in *Jervis B. Webb, supra,* where it stated that "a case or controversy must exist as of the date of the filing of the declaratory judgment action." 742 F.2d at 1398. In a footnote, however, the court stated that it was not reaching "the question whether the establishment of the action is sufficient to sustain the case or controversy requirement to the conclusion of that action." *Id.*

n. 6. The court continued in that footnote to quote *Preiser v. Newkirk,* 422 U.S. 395, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975), a civil rights case cited by Nutrasweet: "The rule in federal cases is that an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." 422 U.S. 395, 401, 95 S.Ct. 2330, 2334 (quoting *Steffel v. Thompson,* 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974)). Nutrasweet also looks to *International Medical Prosthetics Research Assoc. v. Gore Enterprise Holdings, Inc.,* 787 F.2d 572 (Fed.Cir.1986), where the court stated in dictum that the "[t]he burden is on [the declaratory judgment plaintiff] to establish that jurisdiction over its declaratory judgment action existed at, and has continued since, the time the complaint was filed." *Id.* at 575 (holding that no controversy existed at time complaint filed). This language appears in *Akzona, Inc. v. E.I. duPont de Nemours & Co.,* 662 F.Supp. 603 (D.Del.1987), where the court also quoted the *Preiser* "federal rule" in reaching the conclusion that no actual controversy existed because an International Trade Commission order completely eliminated the declaratory judgment plaintiff's "present capacity to enter the U.S. market." *Id.* Nutrasweet finally alerts us to a case in which the Federal Circuit repeated the *Preiser* "rule" in the course of determining that no reasonable apprehension existed when a patentee completely abandoned its charge of infringement prior to trial and then "steadfastly" refused to assert infringement. *Grain Processing Corp. v. American Maize–Products Co.,* 840 F.2d 902, 905–06 (Fed.Cir.1988). In sum, these cases do recite the rule advanced by Nutrasweet, but they do little to illuminate why it should be chosen over that offered by the plaintiffs.

The plaintiffs believe there is equally weighty authority for the proposition that the requisite reasonable apprehension need exist only when the complaint is filed. They point for example to *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.,* 846 F.2d 731 (Fed.Cir.1988), in which the court stated that the "actual controversy" test is "objective and is applied to the facts exist-

ing when the complaint is filed." *Id.* at 736 (citing case). Also, in *Indium Corp. of America v. Semi–Alloys, Inc.*, 781 F.2d 879 (Fed.Cir.1985), *cert. denied*, 479 U.S. 820, 107 S.Ct. 84, 93 L.Ed.2d 37 (1986), it is stated that "reasonable apprehension, like other jurisdictional prerequisites, must exist at the time the suit is filed." *Id.* at 883 (referring to *Jervis B. Webb* test). At first glance, these cases contradict the rule enunciated in the cases cited by Nutrasweet. On the other hand, the rules are not inharmonious because the more stringent of the two incorporates the sole requirement contained in the other. Nevertheless, Federal Circuit precedent leaves us where that court left off in footnote 6 of the *Jervis B. Webb* opinion, i.e., without explicit resolution of the issue raised by Nutrasweet.

After reviewing the cases cited in the briefs and other cases on justiciability, we conclude that the establishment of declaratory judgment jurisdiction at the time a complaint is filed by a potential infringer does not necessarily "sustain the case or controversy requirement to the conclusion of that action." *See Jervis B. Webb*, 742 F.2d at 1398 n. 6. In other words, if the "reasonable apprehension" necessary to create jurisdiction over a patent-related declaratory judgment action disappears during the litigation, the district court lacks jurisdiction and must dismiss the complaint. Our holding in this regard is tempered, as we explain below, with a warning that jurisdiction established when a complaint is filed shall not be disturbed unless the defendant/patentee can demonstrate that the threat of an infringement action is all but extinct.

In reaching this conclusion, we must engage in a little jurisprudential archeology. We begin by analyzing the source of the "federal rule" alluded to in *Preiser*, namely the decision in *Steffel v. Thompson*, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974). As the following exegesis will demonstrate, *Steffel* supports both the rule advanced by Nutrasweet and our application of the rule in this case. In *Steffel*, the

plaintiff Richard Steffel had stopped distributing handbills against the Vietnam war at a Georgia shopping center because he feared that the local police would make good on their explicit threats to prosecute him for criminal trespass. *Id.* at 455–56, 94 S.Ct. at 1213–14. The main issue was whether federal declaratory relief regarding the constitutionality of the trespass statute was precluded when state prosecution was threatened, but not actually pending. Before reaching this issue,[5] however, the Court dealt with the preliminary question of whether a case or controversy existed. The Court found that there was an actual controversy when the complaint was filed because the threats of prosecution were not "imaginary or speculative" and Steffel's concerns were not "chimerical." *Id.* at 459, 94 S.Ct. at 1215–16. But, because the United States' role in the Vietnam war was on the wane by the time the case arrived in the Supreme Court, it felt that the district court should, on remand, examine the *"continuing* existence of a live and acute controversy." *Id.* The district court would have to ask whether subsequent developments in the war "so altered [Steffel's] desire to engage in handbilling at the shopping center that it can no longer be said that this case presents a substantial controversy ... of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* at 460, 94 S.Ct. at 1216. In our view, this is a plain acknowledgement that the Court believed that changing circumstances could negate, in effect, the existence of a controversy even after a complaint is filed.

In explaining how the district court might analyze the continuing existence of an actual controversy, the *Steffel* Court alluded to *Golden v. Zwickler*, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969), where a plaintiff sought a declaration that a state statute that criminalized handbilling was unconstitutional. According to the *Steffel* court, there was no actual controversy in *Golden* because the plaintiff's "sole target of distribution," a Congressman, had retired from the House to become

---

5. The Court eventually held that such relief was available.

a judge. This meant that there was "no immediate prospect of the Congressman's again becoming a candidate for public office." *Id.* 415 U.S. at 459–60, 94 S.Ct. at 1216. In sum, the source of the threat had virtually disappeared.

The *Preiser* case, the progenitor of the jurisdictional question raised by Nutrasweet, is also instructive. There four prisoners, including James Newkirk, were transferred from Walkill Prison in New York State to the much more restrictive Clinton Prison. They brought an action requesting a declaratory judgment that this transfer violated the due process clause of the Fourteenth Amendment of the United States Constitution. *Id.* 422 U.S. at 398–99, 95 S.Ct. at 2332–33. They also requested an injunction ordering their return to Walkill. Before and during trial, all defendants except Newkirk were dismissed. *Id.* During trial, Newkirk himself was returned to Walkill, and the Walkill superintendent placed a memorandum explaining Newkirk's transfer to Clinton in his file. *Id.* at 399, 95 S.Ct. at 2333. The memorandum stated that the transfer was not done for disciplinary reasons and was not to have any bearing on Newkirk's eligibility for parole or time-allowance. *Id.*

The district court held that the transfer from Walkill violated the Fourteenth Amendment because it was done without explanation, and entered a declaratory judgment requiring an explanation and the opportunity to be heard regarding future transfers. The district court also declared that no adverse parole action could be taken because of the earlier transfer. *Id.* At the same time, the court refused to grant an injunction against future summary transfers because there was not a controversy sufficient to warrant adjudication. On appeal, the Second Circuit held that, even though Newkirk had been returned to Walkill, the suit was not moot because Newkirk "remained subject to a new transfer at anytime." *Id.* at 400, 95 S.Ct. at 2334.

The Supreme Court granted certiorari on the due process issue, but also asked for briefing on the mootness question. In de-

ciding that the suit was moot, the court repeated the now familiar axiom that "an actual controversy must be extant at all stages of review, not merely at the time the complaint was filed." *Id.* at 401, 95 S.Ct. at 2334 (quoting case). After noting that the facts alleged, under all the circumstances, would have to show that there is a substantial controversy of sufficient immediacy and reality, the Court then decided against Newkirk. First, the Court noted that Newkirk had been transferred back to Walkill ten months before the district court ruled and that no adverse action had occurred since his return. More importantly, the superintendent's memo stated that the transfer away from Walkill would have "no bearing" on Newkirk's fate; this meant that the authorities harbored "no animosity" toward him. *Id.* The Court felt that the State's actions were not a " '[m]ere voluntary cessation of allegedly illegal conduct,' where [the Court] would leave '[t]he defendant ... free to return to his old ways.' " *Id.* at 402, 95 S.Ct. at 2335. Newkirk's appeal was moot, by contrast, because there was "no reasonable expectation that the wrong will be repeated." *Id.* (citation omitted) (quoting case).

To the Court, the case was also moot because Newkirk's circumstances did not "fall within that category of harm 'capable of repetition, yet evading review.' " *Id.* at 403, 95 S.Ct. at 2335. This was because his "subjective fear" of a future transfer was "remote and speculative," not the kind that casts a "contrary and brooding presence." A plaintiff in Newkirk's shoes, then, "must alleged that he has been or will in fact be perceptibly harmed ..., not that he can imagine circumstances in which he could be affected by the agency's action." *Id.* Newkirk's concerns therefore were the product of imagination, not perception.

■ We believe that *Steffel* and *Preiser* fully support the idea that a declaratory judgment defendant may ask a district court to review whether an actual controversy exists. There is no question that the Supreme Court in those cases exhibited a willingness to do so even after a complaint is filed.

At the same time, these cases appear to place a heavy burden on the party challenging the court's jurisdiction. Jurisdiction vanishes when the threat to the plaintiff is imaginary, illusory, speculative, or fabricated entirely in the plaintiff's mind. Jurisdiction exists, however, where the threat is immediate or real in any perceptible way. These concepts apply to the reasonableness of a declaratory judgment plaintiff's apprehension of a patent infringement action. We believe that apprehension that is reasonable when a complaint is filed remains reasonable unless and until the threat of an infringement action is rendered all but nonexistent by later events. This conclusion is supported by *Preiser*, where the threat of another transfer of the prisoner had ceased; by *Steffel*, where the Vietnam war was near its end; and by *Golden*, where a judgeship had removed from the political arena the "sole target" of the plaintiff's leafleting campaign. The patent cases cited by Nutrasweet also support this rule. In *Akzona*, the Trade Commission order completely cut off any possibility of controversy. In *Grain Processing*, the patentee abandoned its infringement charge and refused to assert it.

On the basis of the above authorities, we will entertain a challenge to established declaratory judgment jurisdiction, but we will do so only where the threat of an infringement suit is virtually, if not completely, extinct. Permitting such challenge on anything less would encourage artful posturing by defendant patentees and would invite them to petition this court whenever the circumstances of litigation change—particularly in a situation such as the present one where a temporary suspension of the threat is based on the voluntary forbearance of the threatening party.

■ Having reviewed the relevant facts and circumstances in light of the standards articulated above, we conclude that Nutrasweet's promise not to sue on the '189 patent pending the outcome of the reexami-

nation has not rendered the plaintiffs' apprehension unreasonable. Nutrasweet has not, as in *Akzona*, abandoned its interest in protecting the patent. Nor has Nutrasweet promised to hold the plaintiffs harmless. Rather than extinguishing the threat to the plaintiffs, Nutrasweet's promise merely suspends it. Because the promise not to sue is of dubious enforceability, Nutrasweet is "free to return to its old ways" and sue whenever it wishes. Even if Nutrasweet keeps its promise, the reexamination proceeding, now underway, could end next year, but it could also end next week. For this reason, we cannot say that the plaintiffs are imagining the threat of a suit or fabricating their worries. Under the case law already discussed, their apprehension of suit is clearly perceptible. This conclusion might, of course, be different if all reexamination proceedings, including appeals, resulted in cancellation of the '189 patent. For present purposes, however, there is an actual controversy before us. We will, therefore, deny defendant's motion to dismiss Counts I and II.[6]

■ Having made this determination, however, we are faced with another question: In view of the fact that many of the issues raised in Counts I and II are presently before the Patent and Trademark Office (the "PTO") as a part of the reexamination of the '189 patent, a process begun by the plaintiffs, and in further view of the fact that this reexamination is apparently very likely to result in the invalidation of the '189 patent, should we stay our proceedings with regard to these two counts in order to avoid deciding issues which may be determined as a result of the reexamination? In a patent proceeding, courts "have inherent power to manage their dockets and stay proceedings, including the authority to order a stay pending conclusion of a PTO reexamination". *Ethicon, Inc. v. Quigg*, 849 F.2d 1422, 1425–26 (Fed. Cir.1988) (citations omitted). The parties have not, however, had an opportunity to

---

6. Inherent in our decision that an actual controversy exists despite Nutrasweet's promise not to sue plaintiffs for infringement until after the completion of the reexamination, is a determi-

nation that, in coming to that decision, we should not explore the likely outcome of the reexamination process itself.

address this issue directly. We will, therefore, leave it until other day.

### B. *Count III*

Count III of the complaint asks for a declaration that the plaintiffs' product "SweetMatch" does not infringe the '131 patent. Nutrasweet has responded to this allegation with a motion for summary judgment to the effect that SweetMatch does indeed infringe claim 8 of the patent. The plaintiffs, not to be outdone, have moved for a summary judgment that SweetMatch does not infringe either claim 8 or claim 2 of the patent. For the reasons explained below, we find that there remain genuine issues of material fact as to the cross motions on claim 8 and deny them. However, we will grant plaintiffs' motion as to claim 2.

#### 1. Facts

The factual background to these motions is complex. This complexity stems in part from the high degree of contention over just what the "facts" are in this case.

##### a. *The Application for a Patent*

Proceedings for the '131 patent originated on April 15, 1966, when Nutrasweet attorney Elliot Schubert, acting as agent for inventor James M. Schlatter, filed an application with the United States Patent Office. The application included the statement that the literature had been searched and no art significantly pertinent to patentability of the invention claimed had been found except for one reference in a 1966 article. The application also included a lengthy specification that stated, among other things:

> The present invention relates to novel compositions which are especially useful in view of their sweetening properties and to novel methods for the use of those compositions as sweetening agents.

> The instant substances which exhibit this surprising sweetening property are dipeptide derivatives characterized by the following structural formula:

> wherein R is a lower alkyl radical.

> The surprisingly potent sweet taste of these dipeptide derivatives is completely unexpected and could not have been predicted from a consideration of their chemical structure ...

> The instant sweetening agents exhibit a remarkably greater potency than does sucrose. The sweetness of an aqueous solution of L–aspartyl–L–phenylalanine methyl ester, for example, can be detected at a concentration between 0.5–1% of that of sucrose. In other words, that dipeptide derivative is 100–200 times as sweet as sucrose. The corresponding ethyl ester is 25–50 times as potent as sucrose.... These dipeptide esters furthermore do not result in the unpleasant after-taste characteristic of synthetic sweeteners such as saccharin and cyclamate. In consequence of their derivation from natural sources, i.e. naturally occurring amino acids, the instant sweeteners are devoid of toxic properties.

> The instant dipeptide sweetening agents are water soluble, stable substances which can be utilized in a variety of physical forms, e.g. as powders, tablets, syrups, etc. Liquid or solid carriers such as water, glycerol, starch, sorbitol, salt, citric acid and other suitable nontoxic substances can be utilized also. These compositions are particularly valuable as sweetening agents for edible materials. Examples of such materials are fruits, vegetables, juices, meat products such as ham or bacon, sweetened milk products, egg products, salad dressings, ice creams and sherbets, icings, syrups, cake mixes and beverages such as carbonated soft drinks and wines.

Docket Item ("DI")–18A at 60–64. The specification went on to explain that the

invention would appear "more fully" from sixteen examples. Nutrasweet noted that the examples were provided "by way of illustration only," and that "the invention [was] not to be construed as limited either in spirit or in scope by the details contained [in the examples] as many modifications both in materials and methods will be apparent from this disclosure to those skilled in the art." *Id.* at 63.

In the application twelve claims were submitted. Only four of these are directly relevant to the motions for summary judgment. These claims, numbered 1, 2, 7 and 8, were originally worded as follows:

1. A sweetening composition consisting of a compound of the formula

wherein R is a lower alkyl radical and the stereochemical configuration is DL–DL or L–L, and a non-toxic carrier therefor.

2. The composition of claim 1 wherein the compound is L–aspartyl–L–phenylalanine methyl ester.

. . . .

7. A method for sweetening edible materials which comprises adding thereto a compound of the formula

wherein R is a lower alkyl radical and the stereo chemical configuration is DL–DL or L–L.

8. The method of claim 7 wherein the compound is L–aspartyl–L–phenylalanine methyl ester.

*Id.* at 71–72.

b. *The PTO Rejects Claims 1–6 and Allows Claims 7–12; Nutrasweet Amends Claims 1–3*

Nothing happened with regard to the application until August 9, 1968, when Schubert conversed with the PTO Examiner in charge of the application. During this conversation the Examiner apparently stated that claims 7 through 12 would be allowed, but that claims 1 through 6 stood rejected because the specific compound of claim 2 was old, having been disclosed in a 1964 article by Morley. In this connection, the Examiner did not feel that the addition of a carrier to an old compound to create a new use necessarily rendered the resulting composition patentable. *Id.* at 75.

Nutrasweet responded to these worries on August 15, 1968 by amending claims 1 through 3, and by pointing out a number of key differences between the compound named in claim 2 and that described in the Morley article. In an attempt to meet the Examiner's concerns, Nutrasweet rewrote the text of claims 1 and 2, underlining new text and bracketing old text:

1. *A composition for the sweetening of edible materials which comprises an amount* [A sweetening composition consisting] of a compound of the formula

wherein R is a lower alkyl radical and the stereo chemical configuration is DL–DL or L–L, *which will afford the degree of sweetness effected by 25–200 times that amount of sucrose* [and] *together with* a non-toxic carrier [therefor].

2. The composition of Claim 1 wherein the compound is L–aspartyl–L–phenylalanine methyl ester *in the amount which will afford the degree of sweetness effected by 100–200 times that amount of sucrose.*

*Id.* at 74–75. Claim 3 was amended to read like claim 2, but went on to state that the corresponding ethyl ester would afford the degree of sweetness effected by "25–50 times" that amount of sucrose. *Id.* at 75.

In amending claims 1 through 3, Nutrasweet made a number of comments about

the relationship between the Morley article and the composition claimed. First, the Morley article, while mentioning the composition encompassed by claim 2, merely described it as a useful intermediate in the preparation of a "particular tetrapeptide" that was itself an intermediate in the synthesis of something else. *Id.* at 75. Second, Nutrasweet noted, the Morley article neither mentioned the sweetening property of the compound nor suggested that it be combined with a carrier. Third, the specification of the present application, unlike the Morley piece, indicated "the sweetening potency of the substance in question" when it compared the sweetness of an aqueous solution of aspartame to one of sucrose. *Id.* at 76. *See also Id.* at 61 (text of specification). With regard to this sweetening potency, Nutrasweet noted that the specification provided "a specific teaching of the amount of material needed to produce the desired effect," and that claims 1 through 3 had been amended "in accordance with those teachings." *Id.* at 76. After surveying some decisions that supported the proposed modifications, Nutrasweet concluded the response by noting that "the claimed compositions are unobvious over the disclosure of the cited Morley publication" and asked that claims 1 through 12 all be allowed. *Id.* at 76–78.

c. *The PTO Objects to Claims 2–6 and Rejects Claim 1; Nutrasweet Amends Claim 1*

On September 27, 1968, the Examiner in charge of the pending application responded to Nutrasweet's request that the claims be allowed as amended. However, the news was not good. He first objected to claims 2 through 6, stating that they were "in fact ultimate species and thus [did] not qualify as true dependent claims." They thus were accepted for filing, but would not be acted upon until made independent. He then rejected claim 1 as being "vague and indefinite in reference to the amount of the dipeptide employed," stating that the claims attempted to "make a sweetening comparison with an unknown," namely sucrose. To the Examiner, there was "simply no way of knowing how much of the active compound is employed." He also asserted

that the addition of a recital of "25–200 times that amount of sucrose" was addition of new matter, and that the specification did not provide any basis for this range. *Id.* at 80. The new matter would have to be canceled.

The Examiner also rejected claim 1 as unpatentable over the Morley article due to obviousness. To the Examiner, Nutrasweet's attempt to provide a sweetness range was inadequate:

First of all, it is not seen that the claims call for an amount of the agent. They merely attempt to equate the amount in terms of the sucrose sweetening power, thus these claims are considered to recite nothing more than an old compound plus a carrier and thus it is obvious in view of the reference.

*Id.* at 81. Second, he felt that the decisions cited by Nutrasweet were not on point. In sum, the Examiner rejected claims 1 and 7 through 12, but noted that 7 through 12 would be allowed if amended to recite "an effective amount of—" after the word "thereof" in claim 7.

On December 6, 1968, Nutrasweet responded to the PTO's latest action on the application. Nutrasweet requested that the objection to claims 2 through 6 be rescinded in light of a recent administrative ruling from the PTO. *Id.* at 83. Turning to the Examiner's reasons for rejecting claim 1, Nutrasweet first addressed the concern that comparing the sweetening ability of aspartame to that of sucrose was a comparison to an unknown. From Nutrasweet's perspective, the contrary was true:

Sucrose and its sweetening potency are well-known. In view of the disclosed potency with respect to sucrose, it would be a simple matter to calculate the amount of sweetening composition to be used for any particular purpose. Applicant's invention involves the finding that certain chemical compounds process a novel and surprising utility, *i.e.* the ability to impart sweetness to edible materials. These compounds possess that utility no matter what quantity is used. The required quantity depends upon the amount of edible material to be sweet-

ened. As is discussed hereinbefore, the appropriate quantity is readily determined from the disclosed potencies relative to sucrose. Applicant thus submits that the instant disclosure clearly teaches how the claimed compositions are to be used, [and] thus complies with the requirements of 35 U.S.C. 112.

*Id.* at 84.

Having dealt with the sweetening ability of sucrose, Nutrasweet then confronted the Examiner's rejection of the "new matter" allegedly found in the range of sweetening potency provided in Nutrasweet's amendment of claim 1. It argued that this range was supported by the disclosure of sweetening potencies made in the specification. In Nutrasweet's view:

> It is clear that the amount of sweetening composition to be used bears an inverse relationship to its potency. The instant dipeptide which is 100–200 times as sweet as sucrose thus is used in 1/100 to 1/200 the amount of that known sweetening agent. Likewise, the less potent dipeptide which is 25–50 times as sweet as sucrose would be used in 1/25 to 1/50 the amount. It is apparent, therefore, that Claim 1 is well supported by the specification.

*Id.* at 84.

Finally, Nutrasweet countered the Examiner's rejection of claim 1 as unpatentable as obvious over the Morley article. Citing decisions it felt were on point, Nutrasweet argued that new compositions containing old compounds could be patentable, *Id.* at 85, and that recitation of an amount was not required because that variable was not critical. *Id.* at 87–88. Nevertheless, Nutrasweet admitted that it "would be willing, however, to amend that composition claim [i.e., claim 1] to include the phrase 'an effective amount of,' consistent with the foregoing amendment of Claim 7." *Id.* at 88. Nutrasweet made the amendment.

d. *The PTO Allows Claims 7–12 and Rejects Claims 1–6; Nutrasweet Amends Claim 1; The '131 Patent Is Awarded*

The next development in the history of the '131 patent occurred on April 23, 1969,

when the PTO allowed claims 7 through 12, but once again rejected claims 1 through 6. *Id.* at 89. The Examiner restated his earlier reasons for rejecting the latter claims: Comparing the sweetness of aspartame to that of sucrose was "meaningless" because sucrose was an "unknown compound," and the claims contained new matter. He reiterated that claim 1 was unpatentable over the Morley article because the piece taught the composition described in claim 1, and because the new claims "define nothing more than the old composition plus a carrier which serves its obvious and expected function." To him, "[t]he intended use of the composition is not a limitation in and of itself and thus there is nothing else upon which unobviousness can be predicated. To equate the sweetening power with that of sucrose likewise does not impart patentability to the claims." *Id.* at 90.

Nutrasweet reacted quickly to the Examiner's rejection of the first six claims. On May 15, 1969, the Examiner interviewed attorney Schubert and made a number of suggestions. *Id.* at 92. On May 21, 1969, Nutrasweet requested cancellation of claim 1 and substitution of a new claim labelled "claim 13." This new claim, which later became claim 1 of the '131 patent, read as follows:

> A composition for the sweetening of edible materials which comprises a compound selected from the group consisting of aspartylphenylalanine methyl ester, aspartylphenylalanine ethyl ester, aspartylphenylalanine *n*-propyl ester, aspartylphenylalanine isopropyl ester and aspartylphenylalanine tertiary-butyl ester, wherein the stereochemical configuration is L–L, DL–DL, DL–L or L–DL, in an amount which will afford the degree of sweetness desired, together with a nontoxic carrier.

*Id.* at 91. Claims 2 through 6 remained unchanged.

Less than a month later, the PTO allowed the claims as now amended. *Id.* at 93–94.[7] Patent number 3,492,131 was issued on January 27, 1970.

As issued, claims 1, 2, 7 and 8 read as follows:

---

7. In August of 1969 Nutrasweet requested a mi-

nor addition to claim 7, one not particularly

1. A composition for the sweetening of edible materials which comprises a compound selected from the group consisting of aspartylphenylalanine methyl ester, aspartylphenylalanine ethyl ester, aspartylphenylalanine *n*-propyl ester, aspartylphenylalanine isopropyl ester and aspartylphenylalanine tertiary-butyl ester, wherein the stereochemical configuration is L–L, DL–DL, DL–L or L–DL, in an amount which will afford the degree of sweetness desired, together with a non-toxic carrier.

2. The composition of claim 1 wherein the compound is L–aspartyl–L–phenylalanine methyl ester in the amount which will afford the degree of sweetness effected by 100–200 times that amount of sucrose.

7. A method for sweetening edible materials which comprises adding thereto an effective amount of a compound of the formula

$$H_2NCH\text{--}CONHCH\text{--}COOR$$
$$CH_2COOH \quad CH_2\text{---}\langle\bigcirc\rangle$$

wherein R is a lower alkyl radical and the stereo chemical configuration is DL–DL, DL–L, L–DL or L–L.

8. The method of claim 7 wherein the compound is L–aspartyl–L–phenylalanine methyl ester.

At long last, Nutrasweet had its patent in hand.

### e. *Regulatory Stay Is Imposed and Lifted; Nutrasweet Obtains Extension of Patent Term*

On December 5, 1975, however, a new obstacle arose. The federal Food and Drug Administration imposed a stay of regulatory approval of aspartame. This stay remained in effect until July 24, 1981, and commercial marketing was not permitted until October 22, 1981. On February 7, 1983, Nutrasweet asked the PTO to issue a certificate of extension for the '131 patent to cover the entire length of the stay: 5 years, 10 months and 17 days. *Id.* at 131–32. On August 1, 1983, PTO Solicitor Joseph F. Nakamura interviewed Nutrasweet's attorney regarding whether an extension would be granted pursuant to 35 U.S.C. § 155.[8] Nutrasweet's general counsel then, on September 12, 1983, mailed a draft extension certificate for the '131 patent to the Commissioner of Patents, expressing his hope that the certificates would "implement the Congressional intent to redress the total blockage of any use of ASPARTAME occasioned by the FDA stay." *Id.* at 150. The Commissioner granted the requested extension on September 16, 1983, but limited it to claims 2 and 8 of the patent. *Id.* at 189.[9]

#### f. *SweetMatch*

It is plaintiffs' product "SweetMatch" which is accused of infringing claims 2 and 8 of the '131 patent. SweetMatch contains, in a single packet, 9 mg of aspartame, 10.5 mg of saccharin, and 980 mg of "excipient," or carrier material.

### 2. Summary Judgment Standards

As the Federal Circuit has outlined, summary judgment is appropriate in a patent case. Indeed, "[w]here no genuine issue of material fact remains and the movant is entitled to judgment as a matter of law, the

---

relevant to the present motions to dismiss. This amendment was allowed. *Id.* at 95, 98.

**8.** *See infra* note 19.

**9.** On September 14, 1983, Solicitor Nakamura wrote to Thomas Scarlett, Assistant General Counsel for the Food and Drug Division of the Department of Health and Human Services regarding construction of § 155. In the letter he asked whether Congress intended the patent term extension to apply to the use of aspartame as a sweetener in the limited number of dry food products originally approved by the FDA, or whether Congress intended the extension to apply to use of aspartame in other food products. *Id.* at 151–52. Scarlett replied on September 16, the same day the extension was granted, by stating that he was unable to answer the question, and had no idea what Congress intended "beyond the words of the law itself." He nevertheless went on to offer what he thought was the "most plausible" interpretation of the statute. *Id.* at 154–55. We need not evaluate this here. *See infra* note 20.

court should utilize the salutary procedure of Fed.R.Civ.P. 56 to avoid unnecessary expense to the parties and wasteful utilization of the jury process and judicial resources." *Barmag Barmer Maschinenfabrik AG v. Murata Machinery Ltd.*, 731 F.2d 831, 835 (Fed.Cir.1985). Summary judgment is not "a disfavored procedural shortcut, but rather ... an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986).

In an infringement case, "the motion of an accused infringer for judgment on the ground of non-infringement of a patent may be granted where the patentee's proof is deficient in meeting an essential part of the legal standard for infringement". *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1577 (Fed.Cir.1989).

Summary judgment is appropriate if the moving party demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). The materiality of the facts is determined by applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Disputes as to irrelevant or tangential facts do not preclude summary judgment. *Id.* Although all factual issues must be drawn in the light most favorable to the non-moving party, *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962), to defeat a summary judgment motion there must be sufficient evidence to support a jury verdict for that party.

For an issue to be genuine, there must be sufficient evidence that a rational trier of fact could find for the non-moving party, and not simply "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986).

> The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552.

### 3. Analysis

#### a. *Claim 8*

■ Because both sides have moved for summary judgment as to claim 8, we will deal first with these cross motions. The parties agree that dependent claim 8, when read together with independent claim 7, effectively recites:

> A method for sweetening edible materials which comprises adding thereto an effective amount of aspartame.

Complaint ¶ 73; DI–18A at 37. The primary source of contention over claim 8 is the phrase "an effective amount." As the following summary of the arguments of the parties shall demonstrate, there remain genuine issues of material fact regarding what this phrase means and whether the composition of SweetMatch is embraced within the limits—if any—of the phrase. We also find that both sides have succeeded in creating a jury question as to whether saccharin is an "edible material".

#### (i). The Positions of the Parties

Nutrasweet's view of the phrase "an effective amount" is that claim 8 covers any and all methods involving addition of any amount of aspartame. This conclusion is, it contends, compelled first by the plain language of claims 7 and 8, which do not contain a specific quantity limitation. As counsel for Nutrasweet stated at oral argument, "[a]s long as an amount sweetens, it is an effective amount." Transcript of Oral Argument 8. Because the aspartame in SweetMatch sweetens, Nutrasweet concludes that the product literally and directly falls within the scope of claim 8.

Nutrasweet also anticipates arguments advanced in defense of the complaint. First, it chastises plaintiffs for trying—in violation of the doctrine of claim differentiation—to impose a limitation found in claims 1 and 2 upon claims 7 and 8. Second, Nutrasweet feels that the patent specification's reference to sweetness potency is only an illustration; it is nothing more than an example and is neither a critical nor a required limitation. Third, it argues that the prosecution history of the patent is devoid of any suggestion that claim 8 is limited as suggested in the complaint. Rather, any references to potency were made with regard to claim 1.

Having placed SweetMatch squarely within the confines of "an effective amount," Nutrasweet asserts that Sweet-Match involves addition of aspartame to an "edible material," namely saccharin. The infringement is thus complete.

In response to Nutrasweet's motion, the plaintiffs aver that SweetMatch does not and cannot infringe claim 8. This is based, first, on the premise that the phrase "an effective amount" is inherently ambiguous. If there are effective amounts, there must be ineffective amounts. In other words, the phrase "effective amount" necessarily implies, in the view of the plaintiffs, that there is some minimal or floor amount of aspartame. The exact location of this floor is ascertained by reference to extrinsic evidence, especially the patent prosecution history and specification, both of which allegedly show that the scope of claim 8 is limited to a finite range of sweetness potencies. Plaintiffs believe that because the sweetness potency of SweetMatch lies outside this range, the product therefore does not infringe claim 8.

The plaintiffs first try to demonstrate that Nutrasweet intended to limit claim 8 to a finite range of potencies by looking to the patent's prosecution history. They point out that Nutrasweet amended claim 7

to recite "an effective amount of aspartame." They see this as nothing less than Nutrasweet's admission that it "gave up" an unlimited scope of the claim. In addition, Nutrasweet told the PTO that the quantity of aspartame needed was directly related to the "disclosed potencies." Since the only potencies disclosed in the application were from 100 to 200,[10] these limits must be read into claim 8, which does not mention them. Finally, they point to Nutrasweet's announcement in correspondence of a "specific teaching of the amount of material needed to produce the desired effect." This teaching was the specification's reference to the 100–200 range.

The plaintiffs' second argument for limiting claim 8 to a range of sweetness potencies is based on the '131 patent specification. The relevant part of the specification follows:

> The instant sweetening agents exhibit a remarkably greater potency than does sucrose. The sweetness of an aqueous solution of [aspartame], for example, can be detected at a concentration between 0.5—1% of that of sucrose. In other words, L–aspartyl–L–phenylalanine methyl ester is 100–200 times as sweet as sucrose. The corresponding ethyl ester is 25–50 times as potent as sucrose.

'131 Patent, col. 1, lines 45–51. Plaintiffs term this passage the "broadest description of the invention" and assert that the 0.5% concentration or 1/200th sweetness figures represent the minimum amounts at which sweetness can be "detected". Plaintiffs go on to reason that these figures represent the minimum "effective amount" at issue here. Plaintiffs also assert that this minimum "effective amount" precludes Nutrasweet from asserting any broader interpretation of the '131 claims. Noting again that SweetMatch employs an amount of aspartame which is substantially less than this purported minimum "effective amount," they conclude that their product

---

10. According to the plaintiffs, the sweetness potency of aspartame for any given concentration is directly related to the amount of aspartame used to sweeten. In their view, the "potency" of aspartame is the ratio of the weight of the

does not infringe the '131 patent.[11]

Defending against Nutrasweet's claim differentiation argument, plaintiffs state that reading a specific potency range into claim 8 will not render claim 2 superfluous: Claim 2 is a composition claim, while claim 8 is a method claim. Plaintiffs also argue that even though their tests show that aspartame can exhibit a sweetness potency outside of the 100–200 range, Nutrasweet must live with the range it knowingly disclosed to the PTO.

Finally, plaintiffs contend that Sweet-Match cannot infringe claim 8 because the saccharin, to which aspartame is added, is not an "edible material" within the meaning of claim 8 and Nutrasweet is estopped from claiming otherwise. They attempt to distinguish saccharin from edible materials by pointing out that the patent does not contemplate using aspartame in combination with saccharin. On the contrary, the patent specifically states that the patented class of dipeptide sweeteners

> do not result in the unpleasant aftertaste characteristic of synthetic sweeteners such as saccharin and cyclamate.

'131 Patent, col. 1, lines 54–59. The patent further states that "the instant sweeteners are devoid of toxic properties." *Id.* Even Nutrasweet's group vice president has, plaintiffs note, sworn that saccharin requires a cancer warning. The argument that saccharin is not an "edible material" is further buttressed by the text of the specification which, plaintiffs claim, explains what "edible materials" are. The specification states that:

> Examples of such materials are fruits, vegetables, juices, meat products such as ham or bacon, sweetened milk products, egg products, salad dressings, ice creams, and sherbets, icings, syrups, cake mixes and beverages such as carbonated soft drinks and wines.

'131 Patent, col. 2, lines 29–36. Plaintiffs point out that this list includes only final or finished foodstuffs and does not mention any synthetic sweeteners or "carriers". Rather, "carriers" are listed separately:

> Liquid or solid carriers such as water, glycerol, starch, sorbitol, salt, citric acid and other suitable *non-toxic* substances can be used also.

'131 patent, col. 2, lines 26–29 (emphasis added). Thus, even if saccharin were a possible carrier, it would be excluded because of its toxic properties. They also note that Nutrasweet's patent agent, Dr. Elliot Schubert, has testified that the "edible materials" category was meant to include foods to which saccharin, sugar, or other sweeteners were added. From all of this, plaintiffs conclude that Nutrasweet cannot now claim that the '131 patent covers aspartame/saccharin blends.

In rebuttal, Nutrasweet supplements its initial arguments by stating that the word "effective" is not ambiguous, but rather is defined in Webster's Third New International dictionary [12] as "producing a decided, decisive, or desired effect". What is more, according to Nutrasweet, the specification does not require a minimum amount of aspartame because the figure noted therein is simply an example pertaining to aqueous solutions. It also notes that the amendment to claim 7 was purely technical. The reference to "a specific teaching" is not a statement of the range of any claim; rather, it is simply a statement of a "single embodiment of the invention." Finally, Nutrasweet denies that it "knowingly confined" its claim to the 100–200 range.

(ii). Summary and Conclusion

Having reviewed the facts and arguments summarized above, we conclude that it would be inappropriate to grant summary judgment on claim 8 today. We find that the facts relied upon by the parties in fashioning their respective positions are

---

sucrose to the weight of aspartame required to afford the same degree of sweetness.

**11.** The plaintiffs also argue that limitation of claim 8 to a 100–200 potency range is confirmed by a Nutrasweet internal memorandum; a scientific article by Schlatter; and other doc-

uments. In view of our findings, we do not examine these items.

**12.** The parties disagree on the dictionary definition of "effective," and we do not resolve the issue today.

material. Furthermore, although the briefs filed in this case occasionally resemble a cross between a nineteenth century sermon and a treatise on higher mathematics,[13] their manipulation of the material facts creates genuine and not metaphysical disputes. For example, the meaning of the phrase "an effective amount" cannot be resolved at this stage because the parties offer very different factual narratives in support of their respective positions. This is plain from their disagreements about the language of claim 8, the text of the specification, and the prosecution history. Put bluntly, if we were to accept wholesale one side's version of the "facts" regarding any one of these issues, we would sweep aside an equally tenable version. In addition, there is considerable discussion in the briefs about the synergistic effect of combining aspartame and saccharine. However, the parties do not discuss the significance, or lack thereof, of synergism on what constitutes an "effective amount" of a particular substance.

We find the same factual divergence in the dispute over whether saccharin is an "edible material". We do not wish to decide this issue in the face of so much contradiction between the narratives offered by the parties. Such picking and choosing among competing but nevertheless facially acceptable versions of the facts is not permitted at this stage of the litigation. It is the type of issue that is more appropriately resolved at trial where the Court can benefit from more extensive testimony and accompanying cross examination. Therefore, we deny both motions for summary judgment on claim 8.

### b. *Claim 2*

According to the plaintiffs, dependent claim 2, when read in conjunction with independent claim 1, effectively reads as follows:

> A composition for the sweetening of edible materials wherein the compound is [aspartame] in the amount which will afford the degree of sweetness effected by 100–200 times that amount of sucrose.

Complaint ¶ 69. Only the plaintiffs have moved for summary judgment regarding claim 2 of the '131 patent. For the reasons stated below, we will grant plaintiffs' motion on the basis that plaintiffs' product, SweetMatch, does not infringe claim 2.

#### (i). The Positions of the Parties

Plaintiffs' motion for summary judgment is based on the simple argument that claim 2 is explicitly limited to the 100–200 potency range, and that SweetMatch has a potency of 300, well outside that range. In support of this view, they point first to the prosecution history of the '131 patent, much of which history has already been reviewed. They also note that claim 1 does not contain an express limitation, while claim 2 does. From this they infer that claim 1 must cover compositions having a potency greater or less than the 100–200 range expressed in claim 2. Such compositions cannot be said to infringe claim 2 because claim 1 is now in the public domain.[14] Finally, plaintiffs proffer test results that show that SweetMatch has a sweetness potency far outside the 100–200 range.

Nutrasweet responds to plaintiffs' claim 2 arguments by accusing plaintiffs of "misleadingly equat[ing] aspartame potency with a sweetening amount of aspartame...." According to Nutrasweet, when the specification states "an aqueous solution of [aspartame], for example, can be detected at a concentration between 0.5—1% of that of sucrose," it is commenting only on the detection of sweetness of aspartame in *water*. Nutrasweet also points out that the cited example does not pertain to sweetening *"edible* materials" in any way, and thus is irrelevant to an interpretation of claims 1 and 2. Even assuming that claim 2 is confined to the 100–200 range, Nutrasweet asserts that there remain genuine issues of material fact regarding (1) whether the tests on SweetMatch were properly done; (2) whether SweetMatch falls within the 100–200 range;

---

**13.** Rodell, *Goodbye to Law Reviews,* 23 Va.L. Rev. 38, 41 (1936).

**14.** Claim 1 expired on January 27, 1987.

and (3) whether SweetMatch infringes claim 2 under the doctrine of equivalents.

### (ii). Summary and Conclusion

 In considering the argument that plaintiffs do not infringe claim 2, we must first of all keep in mind that the burden of proof as to factual issues relating to infringement rests upon the patentee. *Under Sea Indus., Inc. v. Dacor Corp.*, 833 F.2d 1551, 1557 (Fed.Cir.1987). In a declaratory judgment action where the plaintiff pleads non-infringement, the patentee-defendant still has the burden of proving infringement. *Advance Transformer Co. v. Levinson*, 231 U.S.P.Q. 1, 18 (N.D.Ill. 1986), *rev'd in part on other grounds*, 837 F.2d 1081 (Fed.Cir.1988).

In support of their motion, plaintiffs have submitted the affidavit of Dr. Charles Beck, who finds that at a usage level of one sachet of sweetener, equivalent to two teaspoons of sugar, in a cup of coffee, etc., the aspartame in SweetMatch exhibited a potency of 300 or more.

Defendant argues that Dr. Beck's analysis is inadequate or faulty, first because smaller quantities of aspartame, used at lower concentrations, have a higher potency. Therefore, a smaller amount of aspartame may sweeten at a level above the 100–200 range of the patent. Defendant contends that plaintiffs' product in use could in fact provide an aspartame potency within the 100–200 range of the '131 patent, depending on the amount of sweetener—and consequently of aspartame—employed. Plaintiffs acknowledge that lower concentrations of aspartame have a higher potency. They point out, however, that to use SweetMatch in amounts that would result in a 100–200 potency range would require seven and one half sachets of SweetMatch in a cup of coffee, or the equivalent of 15 teaspoons of sugar. We do not find that such an unlikely exaggeration of normal use amounts to infringement by a product that has not been demonstrated to infringe with expected use.

Moreover, defendant, in arguing that a potency range of 300 infringes, collides with the plain language of claim 2 and its expressed 100–200 range of potency. In view of the expiration of claim 1 and the specific language of claim 2, we find that the use of aspartame in a potency range over 200, or under 100, does not infringe claim 2.

Defendant next argues that Dr. Beck's tests are limited to single, low concentrations of aspartame, thereby skewing his aspartame potencies "higher than 200." However, defendant has presented no evidence to show that other tests might demonstrate that the amount of aspartame in SweetMatch can fall within the infringing range.

Defendant has in effect failed to make a showing sufficient to establish an element essential to its case; i.e., the element of infringement. There is therefore no issue of material fact regarding infringement. Plaintiffs are entitled to summary judgment as to claim 2 on the ground that they do not infringe that claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

Defendant also argues that plaintiffs infringe claim 2 under the doctrine of equivalents. Defendant's reasoning is somewhat conclusory:

> The way in which plaintiffs' product and its aspartame component sweeten is substantially the same as the way in which aspartame alone sweetens. Although the saccharin component of plaintiffs' product may provide a bitter aftertaste for some consumers in some applications, nevertheless the sweetness intensity provided by plaintiffs' product and the equivalently-sweet 100% aspartame product would be substantially the same. DuBois Aff. ¶ 13.

D.I. 75 at 46–47.

[A]ccording to the accompanying affidavit of Dr. Grant E. DuBois, in use, plaintiffs' product, and its aspartame component, are the full factual equivalents of the use of an amount of aspartame alone which provides a potency of 100–200. Indeed, even plaintiffs' expert, Dr. Beck, admitted that a consumer would essentially be unable to distinguish, for example, between aspartame alone and plain-

tiffs' product when used in equivalent sweetening amounts in coffee.

*Id.* at 56–57.

The fact that plaintiffs' product performs the function of sweetening to obtain the result of sweetness is not in itself enough to infringe under the doctrine of equivalents. Defendant has not demonstrated that saccharin, or a combination of aspartame and saccharin, sweetens in the same *way* that aspartame does. *See, e.g., Graver Tank & Mfg. Co. v. Linde Air Prods. Co.,* 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). Without demonstrating that necessary third factor of the doctrine of equivalents, defendant fails in its effort to demonstrate infringement. *See Spectra Corp. v. Lutz,* 839 F.2d 1579, 1582 (Fed.Cir. 1988). Defendant has the burden of proving that aspartame (a naturally occurring amino acid) and the plaintiffs' product (a combination of saccharin, a synthetic, and aspartame) bring about in substantially the same way the reaction which results in a sweet taste in one's mouth. Defendant has failed to produce evidence to meet that burden. Therefore, under *Celotex,* plaintiffs are also entitled to summary judgement to the effect that they do not infringe claim 2 under the doctrine of equivalents.

### C. *Count IV*

Nutrasweet has moved to dismiss Count IV for failure to state a claim. In deciding such a motion, this Court will accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn from them. We will not grant dismissal unless it is certain that no relief could be granted under any set of facts which could be proved. As we explain below, we will grant Nutrasweet's motion to dismiss Count IV.

### 1. Facts

Count IV is based in part on allegations that Nutrasweet and its predecessors engaged in a number of inequitable practices

---

before the Food and Drug Administration, the Congress and the PTO. As set out by plaintiffs in the complaint, the story begins in the 1970s, when Nutrasweet first had contact with the FDA with regard to the '131 patent. According to the plaintiffs, after the '131 patent was issued, Nutrasweet filed a food additive petition seeking FDA approval of both "dry" and "wet" uses of aspartame in various foods. A "wet" use involves the sweetening of a liquid, such as carbonated beverages. A "dry" use involves food compositions, such as gelatins. FDA officials responded to the petition with the news that the toxicity data submitted by Nutrasweet could support only "dry" uses of aspartame. Nutrasweet then revised its proposed regulation to include only dry food systems and compositions; "wet" uses were not mentioned. On July 26, 1974, the FDA approved Nutrasweet's application to use aspartame in dry foods, but stayed this approval on December 5, 1975 pending further investigation.[15] The stay remained in effect for a total of five years, ten months, and seventeen days, until October 22, 1981.

During the stay of approval of "dry" uses of aspartame, Nutrasweet decided to seek legislation that would permit extension of the term of the '131 patent. According to the plaintiffs, Nutrasweet's efforts culminated in passage of exactly what it sought, namely 35 U.S.C. § 155.[16] Plaintiffs describe the history of this bill as follows: On January 27, 1981, Senator Charles Mathias introduced Senate Bill S. 255. He remarked on the Senate floor that S. 255 was meant "to restore to products subject to premarket review requirements a period equal to the time required for this clearance—up to a maximum of seven years". He also stated that "such restoration of the patent will apply only to the specific purpose or use involved in the regulatory approval and not to the entire range of products that might result from the original patent grant". The Senate Judiciary Committee's report on S. 255 echoed

---

**15.** On August 13, 1982, Nutrasweet filed a supplemental petition to permit use of aspartame in carbonated beverage systems and compositions. It was approved on July 8, 1983.

**16.** *See infra* note 19.

this sentiment: "The extension applies only to those claims of the patents which cover the product subject to regulatory review. Furthermore, if a claim of the patent covers a generic group of chemicals, the extension would apply only to the chemical of the group which has undergone the regulatory review." Then, on July 9, 1981, Senator Howell Heflin proposed an amendment to S. 255 which added specific language that would allow Nutrasweet and other patentees to ask the PTO for extension of the term of patent protection for compositions subject to the regulatory stay in effect between December 5, 1975, and October 22, 1981. In connection with this amendment, he stated that "restoration would apply only to the specific purpose or use involved in the regulatory approval and not to the entire range of products that might result from the original patent." Senate Bill S. 255, even though passed with the Heflin amendment, never became law.[17]

In the latter half of 1981, the House Subcommittee on Courts, Civil Liberties, and the Administration of Justice of the Committee on the Judiciary held public hearings on patent term extension. In November, John Robson, a Nutrasweet vice president, testified regarding "an amendment the Senate made when it passed this legislation."[18] Robson alluded to the fact that Nutrasweet had been granted "a use patent on aspartame as a sweetener," a reference to the '131 patent. At some point in the hearings, Representative Kastenmeier questioned Robson and the following exchange took place:

MR. KASTENMEIER: Is aspartame unique in this connection? Is there any patent for a product approved by FDA other than that in the Senate bill?

MR. ROBSON: We sought to find out if there were others. FDA advised us they knew of none. We are not aware of any, though I can't guarantee to the committee there aren't any.

Nearly a year after this colloquy occurred, the House Judiciary Committee favorably reported H.R. 6444 (a bill substantially identical to S. 255) to the full House, but the bill failed.

The issue of patent term extension was not, however, dead for long. On October 1, 1982, the Senate approved Senator Heflin's amendment to the Orphan Drug Act, one that was substantially like that woven into the failed Senate Bill S. 255. Both houses of Congress approved H.R. 5238 as amended, with the Heflin amendment becoming law at 35 U.S.C. § 155 on January 4, 1983.[19]

Soon after enactment of § 155, Nutrasweet filed joint requests for a patent term extension of five years, ten months, and seventeen days for both the '131 and '189 patents. This was the first time that Nutrasweet had raised the possibility of an extension of the '189 patent. On August 31, 1983, Nutrasweet filed briefs in support of the applications with the PTO. The briefs sought extension of all claims for both patents. On September 12, 1983, Nutrasweet submitted a "draft extension cer-

17. Representative Kastenmeier introduced a similar bill in the House of Representatives in February 1981. This bill, like S. 255, was not made into law.

18. It is not clear from the complaint whether the "legislation" referred to was S. 255 or another piece of legislation.

19. Section 155 provides in pertinent part that: ... the term of a patent which encompasses within its scope a composition of matter or a process for using such composition shall be extended if such composition or process has been subjected to a regulatory review by the [FDA] pursuant to the Federal Food, Drug, and Cosmetic Act leading to the publication of regulation permitting the interstate distribution and sale of such composition or process

and for which there has thereafter been a stay of regulation of approval imposed ... which stay was in effect on January 1, 1981, by a length of time to be measured from the date such stay of regulation of approval was imposed until such proceedings are finally resolved and commercial marketing permitted. ....

... On receipt of [appropriate notice], the Commissioner shall promptly issue to the owner of record of the patent a certificate of extension, under seal, stating the fact and length of the extension and identifying the composition of matter or process for using such composition to which such extension is applicable....

35 U.S.C. § 155.

tificate" for each patent; these certificates provided that the extension of the patent terms would apply only to claims 2 and 8 of the '131 patent and to claims 7 through 12 and 17 through 19 of the '189 patent. On September 16, 1983, the Commissioner of Patents issued a certificate extending these claims. He did not, however, limit the extension to dry food systems or compositions.[20]

## 2. Analysis

In their complaint, the plaintiffs assert three related grounds for a declaration that the '131 and '189 patents are invalid. All of these grounds are related to the extensions granted. We consider these contentions in sequence.

### a. *Inequitable Conduct in Applying for Extension of the '189 Patent*

 First, plaintiffs claim that Nutrasweet engaged in inequitable conduct by failing to mention to the PTO in its application for an extension of the '189 patent either Nutrasweet's alleged inequitable conduct during the original prosecution of the patent or the patent's invalidity in light of prior art. We reject these contentions because we cannot imagine that, without so specifying, Congress intended that a patentee, in seeking an extension under § 155, justify *ab initio* the original grant of the patent. We do not imply by this conclusion that the granting of an extension would exonerate a patentee of any inequitable conduct committed before the Patent Office in obtaining the initial award of the patent. However, a patent does carry with it a presumption of validity. This presumption persists until the patent is determined to be void or unenforceable. In light of the presumption of validity, we cannot see that a patentee should have to challenge the validity of its own patent in seeking an extension under § 155. We will grant the motion to dismiss Count IV insofar as plaintiffs rely therein upon their theory that a petition for extension pulls into consideration matters relevant to the original application for the patent.

### b. *Unclean Hands in Seeking Legislation Permitting Extension of Patents and In Successfully Obtaining Extensions Under the Terms of the Relevant Statute*

 Count IV of the complaint also claims that both the '131 and '189 patent term extensions are unenforceable due to Nutrasweet's unclean hands because 1) Nutrasweet misrepresented, in seeking legislation from Congress, that it wished to extend the term of only one "aspartame patent" (the '131 patent) when in fact it intended to extend the term of both the '131 and the '189 patents; 2) Nutrasweet then, in petitioning to extend both patents, did not reveal this legislative history to the Commissioner; and 3) Nutrasweet petitioned to extend the term of both patents when it knew that the '189 patent was "materially erroneous in content, invalid, and unenforceable." The plaintiffs argue that because Nutrasweet made a joint petition to extend both patents, its misconduct involving the '189 patent "infects" and precludes the enforceability of the extended term of the '131 patent as well. Plaintiffs concede that this is a "novel" theory. We believe this is a charitable description of the theory and will grant the motion to dismiss it.

First of all, in considering these arguments, we conclude that plaintiffs are attempting to create a standard of candor where none exists. We will start our analysis by looking at what plaintiffs describe as the legislative history. There is no avoiding the fact that the legislative history, as set out in the complaint, is fragmented and at times vague. For example, the brief excerpt of the 1981 testimony by a Nutrasweet official before a House subcommittee does not appear to be the smoking gun that the plaintiffs would like it to

---

**20.** Joseph Nakamura, the Solicitor of the PTO, had on September 14, 1983, questioned the FDA about the scope of § 155: Did it apply to a range of uses within a claim or only to specific uses, such as "dry" uses of aspartame, which had been subject to regulatory review? The FDA eschewed knowledge of Congressional intent but expressed a preference for a broad or literal "claim" interpretation of § 155. D.I. 18A at 150–151.

be. As we have set out above, Representative Kastenmeier asked John Robson a rather nebulous question and received an appropriate answer. Of course, the context of the exchange is not discernable from the snippet provided in the complaint. It is not clear, for example, what "connection" Representative Kastenmeier had in mind when he referred to aspartame. Yet it is clear that he did not ask Nutrasweet whether *the '131 patent* was the only one approved by the FDA that would be covered by the proposed legislation. He inquired about "aspartame," a compound covered by both the '131 and '189 patents. It is quite conceivable that Robson meant to convey that Nutrasweet and the FDA knew of no *non-aspartame* patents that would be covered. We cannot say that a reasonable PTO Commissioner would have found this exchange to be important in deciding to extend either patent. The same is true of the other facts alleged in the complaint.

However, even if Robson's statement to Representative Kastenmeier had been intended to conceal Nutrasweet's true designs in seeking the legislation, we doubt that it involves any violation of a duty of disclosure. The reason for high standards of conduct and candor before the Patent Office is the *ex parte* nature of the proceedings there. *See, e.g., In re Multidistrict Litigation Involving Frost Patent,* 540 F.2d 601, 611 n. 36 (3d Cir.1976). The Patent Office and the applicant for a patent are more fiduciaries than antagonists. *CTS Corp. v. Electro Materials Corp. of America,* 469 F.Supp. 801, 823 (S.D.N.Y. 1979).

> With the seemingly ever-increasing number of applications before it, the Patent Office has a tremendous burden. While being a fact-finding as well as an adjudicatory agency, it is necessarily limited in the time permitted to ascertain the facts necessary to adjudge the patentable merits of each application. In addition, it has no testing facilities of its own. Clearly, it must rely on applicants for many of the facts upon which its decisions are based. The highest standards of honesty and candor on the part of

applicants in presenting such facts to the office are thus necessary elements in a working patent system. We would go so far as to say they are essential.

*Norton v. Curtiss,* 433 F.2d 779, 794 (CCPA 1970). This duty of candor attaches to the application for a patent and to the extent and nature of the information provided in connection therewith. However, the duty of candor is not without bounds. It has been held, for instance, that it does not extend into adversarial proceedings. *See, e.g., Atlas Powder Co., v. Ireco Chemicals,* 773 F.2d 1230, 1234 (Fed.Cir.1985) (a possible lapse of candor by plaintiff's counsel in prior litigation does not taint that prior suit nor can nonparties to the prior suit take advantage of it in the case then before the court).

We arrive at two conclusions concerning the duty of candor as it may apply in this case. First of all, we find no requirement of or authority for any duty of candor before Congressional committees such that a violation of that duty would render unenforceable any patent. Congressional hearings are not *ex parte* proceedings at which members of Congress depend on the frankness or integrity of a particular witness to receive the full scope of information pertinent to the merits of a proposed piece of legislation. In addition, an adversarial method of interrogating witnesses is permitted at Congressional committee hearings.

Furthermore, we find no requirement of or authority for any duty of candor requiring a patentee who requests administrative action from the Patent Office under the provisions of a statute to provide a legislative history of that statute to the Patent Office. We would leave it to the legal advisors of the Patent Office to supply any appropriate statutory interpretation, including legislative history, of laws under consideration by the PTO. We find this to be so even if the applicant before the Patent Office participated in that legislative history.

█ Moreover, even if we had determined that a duty of candor was violated in this case, we do not find that such a breach rises to the level of "inequitable conduct."

The test for inequitable conduct is relatively simple. The party raising the defense must show that the patentee (1) withheld *material* information, and (2) that the misrepresentation or omission was *intentional*. See *J.P. Stevens & Co. v. Lex Tex Ltd.*, 747 F.2d 1553, 1559 (Fed.Cir.1984), *cert. denied*, 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985). Once materiality and intent are established, the court must balance them and determine as a matter of law whether the scales tilt to a conclusion that inequitable conduct occurred and the patent is unenforceable. *Id.* at 1560.

As the Federal Circuit has noted, there are four possible tests of materiality: (1) objective "but for"; (2) subjective "but for"; (3) "but it may have been"; and (4) PTO Rule 1.56(a). *Id.* at 1559. The Federal Circuit has adopted the PTO Rule, which holds that information is material if there is a substantial likelihood that a reasonable examiner would have considered the omitted reference important. *See, e.g., Western Elec. Co. v. Piezo Technology, Inc.*, 860 F.2d 428, 433 (Fed.Cir.1988).

We have little trouble concluding that the "legislative history" described in the complaint is immaterial. First, we have grave doubts that the events described in the complaint are the true "legislative history" of § 155. The details outlined in the complaint occurred over a period of three years and involved at least three separate pieces of legislation. Section 155 itself was the result of an amendment tacked on to another piece of legislation relating to orphan drugs.

Moreover, as we note above, legislative history is a conglomerate of information, obtained at hearings which are adversarial in nature and of public record. If the Patent Office wishes to peer into arcane interpretations of patent statutes, we doubt that it will rely on partisan applicants before the PTO to show it the way.

Having held that the information withheld from the Patent Commissioner is immaterial, we need not determine whether Nutrasweet intended to withhold it. It is our view, then, that Nutrasweet did not commit inequitable conduct while petitioning for an extension of the terms of the '189 and '131 patents. Therefore, both because we find no duty was violated and because, even if it were, we find that the information, if misleading, was immaterial, the motion to dismiss this aspect of Count IV will be granted.

### c. *Impropriety of PTO's Extension of Patents to Include Both Wet and Dry Uses*

The third part of Count IV alleges that the PTO improperly extended the '131 and '189 patents to embrace *any* composition of aspartame, i.e., wet and dry uses, without limiting the extension to food compositions subject to the regulatory delay, i.e., dry uses alone. Nutrasweet counters the plaintiffs' claim by asserting that the extensions were granted in accordance with the plain meaning of § 155. It points out that the statute requires the PTO to grant an extension if the patent meets the conditions outlined in the statute. Since the patent fulfilled these conditions, the PTO had no choice but to obey Congress's command and extend the terms of the patents.[21] The plaintiffs reply that the "legislative history" described above directly contradicts the supposedly plain meaning of the statute and urge this court therefore to interpret the statute to forbid extensions of uses that were not subject to regulatory review.

Our decision that, even if there were a duty of candor concerning legislative history, the purported legislative history of § 155 is immaterial rested on the clear language of the statute itself. Section 155 sets out certain conditions under which a

21. Nutrasweet propounds the alternative argument that there is no justiciable controversy with respect to the extensions covering wet uses because the plaintiffs, at the time the complaint was first filed, had no plans to import or sell any product that could be considered a "wet" use. Citing various parts of the original complaint, Nutrasweet concludes that the "actual controversy" component of the Declaratory Judgment Act has not been met. The plaintiffs reply that their complaint, especially as amended, states just the opposite. *See* ¶¶ 109 and 15 of the amended complaint. Because we dismiss the plaintiffs' claim on a different ground, we do not reach these arguments.

patent term extension may be granted. If a patent meets those conditions, it "shall" be granted. 35 U.S.C. § 155. Whatever was said on the Senate floor and in House hearing rooms is irrelevant to the rather mechanical process of determining whether a specific patent meets the prerequisites for a term extension under the command of § 155. In short, we find that the language of § 155 is clear. Therefore, a reasonable Patent Commissioner would not need to consider information regarding the alleged legislative history of § 155 in deciding whether to grant the extension of either the '131 or the '189 patents.

Nor do we consider that this court should indulge in a review of legislative history to arrive at a determination that the Patent Office erred by extending *claims* of the '131 and '189 patents, rather than specific *uses* incorporated within the language of the claims. As we have stated, the statute is clear on its face. It instructs the Commissioner to extend "the term of a patent which encompasses within its scope a composition of matter or a process for using such composition" which has been subject to regulatory review by the FDA. The Commissioner issues a certificate of extension "identifying the composition of matter or process for using such composition to which such extension is applicable." It is consistent with the theory of our patent laws to extend a patent by *claims* of that patent and not by *uses* that are not specifically described within the language of the claims. This is so because the purpose of claim description in a patent is to notify the world of what the patent covers.

> The function of claims is (a) to point out what the invention *is* in such a way as to distinguish it from what was previously known, i.e., from the prior art; and (b) to define the *scope of protection* afforded by the patent. In both of those aspects, claims are not technical descriptions of the disclosed inventions, but are legal documents like the desiptions of lands by metes and bounds in a deed which *define the area* conveyed but *do not describe the land....*

*In re Vamco Mach. and Tool, Inc.,* 752 F.2d 1564, 1577 n. 5 (Fed.Cir.1985). *See also Standard Oil Co. v. Tidewater Associated Oil Co.,* 154 F.2d 579, 582 (3d Cir. 1946). Because the *claim* defines what is covered by the patent, those familiar with the art can tell, by reading the claim what is covered by the patent. Similarly, those familiar with the art can tell, by reading the claim, what is covered by an extension under § 155. If, however, particular uses were extended under the provisions of § 155, the public could not tell by the language of the patent itself what exactly had been extended.

In sum, we hold that the PTO acted in perfect compliance with the dictates of § 155 when it granted the extensions. The plaintiffs' claim to the contrary shall be dismissed.

### III. CONCLUSION

For the reasons explained above, we shall deny Nutrasweet's motion to dismiss Counts I and II of the complaint. We also shall deny the cross-motions for summary judgment on claim 8 of the '131 patent Count III, and shall grant the plaintiffs' motion for summary judgment on claim 2. Finally, we shall grant the motion to dismiss Count IV. An appropriate order shall follow.